KOSTAMO v MARQUETTE IRON MINING COMPANY

BULLARD v COPCO STEEL & ENGINEERING

HANNULA v THE CLEVELAND-CLIFFS IRON COMPANY

FISZER v WHITE PINE COPPER COMPANY

JARMAN v ATLAS SUPPLY COMPANY

Docket Nos. 56000, 56729, 56915, 56934, 57479. Argued January 5,
1977 (Calendar Nos. 8-12).—Decided January 12, 1979.

The common issue in these "heart attack cases" is that each of
the workers whose claim is in suit suffered from arteriosclerosis
and a disabling or fatal heart event occurred which each
plaintiff alleges was caused by work-related stress, entitling
each to workmen's compensation benefits.

Onnie T. Kostamo died following a series of heart attacks which
occurred while he was working at defendant Marquette Iron
Mining Company. He had suffered from arteriosclerosis for
several years; his job maintaining a kiln discharge area re-
quired him to use a front-end loader to remove hot iron ore
from the kiln area and to hose down the area. The Workmen's
Compensation Appeal Board denied compensation benefits be-
cause the heart attacks were not found to be work-related. The
Court of Appeals, Allen, P.J., and J. H. Gillis and Quinn, JJ.,
affirmed in a memorandum opinion (Docket No. 17010). Plain-
tiff appeals.

Clarence S. Bullard suffered from mild congestive heart failure

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 7, 9, 10, 13, 16, 18] 82 Am Jur 2d, Workmen's Compensation
§§ 240-243, 290-293.

[3] 82 Am Jur 2d, Workmen's Compensation § 300.

[4] 82 Am Jur 2d, Workmen's Compensation § 240.

[5, 6] 82 Am Jur 2d, Workmen's Compensation §§ 240, 537.

[8, 14] 82 Am Jur 2d, Workmen's Compensation §§ 533-537.

[11] 81 Am Jur 2d, Workmen's Compensation § 229.

[12] 82 Am Jur 2d, Workmen's Compensation § 540.

[13] 82 Am Jur 2d, Workmen's Compensation § 552.

[14] 82 Am Jur 2d, Workmen's Compensation §§ 515, 516.

[15] 82 Am Jur 2d, Workmen's Compensation §§ 547, 635.

[17] 82 Am Jur 2d, Workmen's Compensation §§ 630, 631.

with peripheral edema, was for a time unemployed because of his heart trouble, and then returned to work as a truck driver at Copco Steel Engineering contrary to medical advice. Six weeks after returning to work Bullard suffered a myocardial infarction while driving his employer's truck and died a few minutes later. The Workmen's Compensation Appeal Board denied compensation benefits against defendants Copco Steel and Employers Mutual Liability because it found no relationship between his employment and his death. The Court of Appeals, Lesinski, C.J., and Bashara and N. J. Kaufman, JJ., denied leave to appeal (Docket No. 21978). Plaintiff appeals.

Paul J. Hannula worked for the Cleveland-Cliffs Iron Company; his job was to scrape, bar, drill or blast iron ore chunks. He began to have arm and chest pains, and was advised by his doctor not to return to work because he suffered from arteriosclerosis and angina which was aggravated by his employment. The Workmen's Compensation Appeal Board denied him disability benefits. The Court of Appeals, J. H. Gillis, P.J., and N. J. Kaufman and O'Hara, JJ., denied leave to appeal (Docket No. 22701). Plaintiff appeals.

Jan Fiszer worked for White Pine Copper Company as a greaser or lube man, a job which involved crawling, climbing, and lifting, until he was involved in an accident with his lube truck. He had chest pains after the accident, was diagnosed as having a heart ailment, and was away from work for 17 months. A few months after he returned to White Pine Copper, working as a "hooker", he developed severe chest pain while unloading a truck in below-zero weather and his doctor advised him not to return to work because his employment aggravated the heart condition. The Workmen's Compensation Appeal Board denied Fiszer disability benefits, and the Court of Appeals, T. M. Burns, P.J., and D. E. Holbrook, and D. F. Walsh, JJ., denied leave to appeal (Docket No. 22599). Plaintiff appeals.

Jack Jarman worked for Atlas Supply Company as a truck driver and general laborer, usually for 60 to 80 hours a week. He suffered a myocardial infarction at home about 10 hours after a 9-hour day of loading and unloading bags of material. The Workmen's Compensation Appeal Board awarded Jarman compensation benefits against Atlas and the Michigan State Accident Fund. The Court of Appeals, Quinn, P.J., and Danhof and Allen, JJ., denied leave to appeal (Docket No. 24606). Defendants appeal. *Held:*

1. The workers' compensation law does not provide compensation for a person afflicted by an illness or disease not caused or aggravated by his work or working conditions, nor is a

different result required because debility has progressed to the point where the worker cannot work without pain or injury. Accordingly, compensation cannot be awarded because the worker may suffer heart damage which would be work-related if he continued to work. Unless the work has accelerated or aggravated the illness, disease, or deterioration and, thus, contributed to it, or the work, coupled with the illness, disease, or deterioration, in fact causes an injury, compensation is not payable.

The Workmen's Compensation Appeal Board found that Hannula and Fiszer had not suffered heart damage. Those findings are supported in the evidence. Therefore, whatever the stress of the jobs, there was no injury. Since stress does not aggravate arteriosclerosis, the Workmen's Compensation Appeal Board decisions denying them compensation must be affirmed. Although there is a causal relationship between the underlying disability, arteriosclerosis, and Hannula's and Fiszer's inability to continue working, that disability was not caused and could not have been aggravated by their employment.

2. In the present state of medical knowledge, it is known that stress can cause a heart attack, and that persons who have arteriosclerosis are more likely to suffer heart attacks as a result of stress than those who do not. It is also known that it is not possible to determine medically whether a particular stress caused a particular injury. Nevertheless, compensation may be awarded based on an assessment of the probabilities in the light of the background factual circumstances and any opinion testimony. Opinions tentatively expressed may not on that account be discounted, nor may preclusive effects be given to medical testimony. Where the issue is whether job stress caused the injury, there are two inquiries, one factual, the other judgmental. The factual inquiry concerns the working and other conditions of the worker's life claimed to constitute the stress that led to the heart attack, and clearly does not require medical testimony; anyone familiar with the facts can state them. The judgmental question is whether the asserted stress did cause the heart attack; it is not entirely the province of the medical profession, but the trier of facts is permitted to draw natural inferences from all the evidence and testimony, lay and medical, in deciding whether there is the requisite relationship between the asserted stress and the claimed heart attack.

3. Medical theory appears to be unanimous that work-related stress can precipitate or aggravate cardiac injury. The Legislature has, for certain occupations, created a presumption that a

relationship between employment and cardiac injury exists, and the Court has approved recovery under the workers' compensation law for heart injury caused by job-related stress. The Court does not add to or disturb those precepts, but, rather, addresses matters of proof. In a workers' compensation case, the claimant must show a reasonable relation of cause and effect between work and injury. The employment need not be the sole cause; it is enough if it contributes to the injury. Medical testimony in the context of compensation proceedings for cardiac injuries often encounters special difficulties. Cross-pollination of medical and legal concepts of causality can confuse the ultimate issue and undermine the function of the fact finder. Doctors and lawyers approach the problem of cause from different perspectives. Medically, the cause may be considered that activity or agent without which a condition would not have appeared; the medical assessment of causality in heart cases is complicated by the many factors involved in the causation and progression of an individual's cardiac disorder. From the legal point of view, if some factor or element plays a role in bringing about a result sooner than would ordinarily be expected, it may be considered a "cause" for which legal liability may attach, however insignificant it may be in the expected course of the underlying cardiac disease process.

4. In *Kostamo* the Workmen's Compensation Appeal Board made no attempt to relate the circumstances surrounding his heart attack, developed through lay testimony, to the medical testimony. Factors which have been regarded as significant by courts and commentators were not evaluated by the Workmen's Compensation Appeal Board. Temporal proximity of the cardiac episodes to the work experience, the hot and dusty conditions of employment, the return to work after each episode and the mental stress to which Kostamo was subjected are potentially significant factors in the causal equation and were not even adverted to by the Workmen's Compensation Appeal Board in its brief and conclusory opinion. This does not suggest that any or all of these factors should always be, or are here, dispositive. Rather, the Court holds that the Workmen's Compensation Appeal Board erred in *Kostamo* by giving preclusive effect to the *conclusion* of a medical expert and in failing to treat facts developed in lay testimony. Lay testimony should not be ignored when considering the causal connection between employment and a heart attack. While medical testimony may be helpful, even, ultimately, decisive, the trier of fact is obligated to consider all the testimony in determining legal causation.

The Workmen's Compensation Appeal Board, in *Kostamo,*

spoke of the "experienced referee [who] heard all the evidence". Putting aside that the medical testimony was on deposition, the Workmen's Compensation Appeal Board is obliged to review *de novo* the decision of the hearing examiner, and the primary function of the appeal board is that of finding what to it are the controlling facts. The Constitution and the statute grant finality to the findings of fact of the Workmen's Compensation Appeal Board, not of *a* referee. The Workmen's Compensation Appeal Board, no less than the testifying experts, must examine and address the circumstances surrounding the cardiac episode which suggest a causal link.

The appeal board apparently placed critical importance on the comparative certainty with which the doctors expressed themselves. Failure to state a medical opinion with certainty reflects the current status of scientific knowledge, not a lack of merit in the claimant's position. The manner in which a doctor's opinion is expressed is not determinative of its probative value.

5. In *Bullard,* no evidence of stress or of the circumstances under which he worked was offered. The expert witness for Bullard's widow assumed that there was stress and gave his opinion based upon such assumptions. There being no evidence that in fact there was stress or of its nature, he could not relate his opinion to actual job stress. The Workmen's Compensation Appeal Board's conclusion that there was a failure in *Bullard* to prove a work-related injury must be affirmed.

6. In *Jarman* the Workmen's Compensation Appeal Board rejected the suggestion that Jarman's expert's testimony was of little probative value because his opinions were expressed tentatively. The manner in which a doctor's opinion is expressed is not determinative of its probative value. The Workmen's Compensation Appeal Board's opinion in *Jarman* does not appear to have granted preclusive effect to a medical conclusion. The bulk of the opinion is devoted to a detailed explication of circumstances surrounding Jarman's heart attack and underlying the expert's opinion. The Workmen's Compensation Appeal Board's review of testimony—the difficult work schedule, time pressures, physical labor and sense of responsibility under which Jarman labored—adequately support *its* conclusion that work-related physical and emotional stress existed and contributed to Jarman's heart attack.

The opinion of the Workmen's Compensation Appeal Board in *Kostamo* is vacated and the case is remanded to it for further proceedings and detailed findings of fact on the issue whether his heart attack was caused or aggravated by stressful

working conditions. The decisions of the Workmen's Compensation Appeal Board are affirmed in *Bullard, Hannula, Fiszer* and *Jarman.*

Justice Ryan, joined by Chief Justice Coleman and Justice Fitzgerald, would affirm the decision of the appeal board in each case:

1. A claimant seeking workmen's compensation must establish both a personal injury and a "medical cause in fact" relationship between his employment and that injury. Absent a showing of the requisite factual relationship between a personal injury and the claimant's employment, the injury cannot logically be said to arise "out of and in the course of his employment".

2. In *Kostamo* and *Bullard* the Workmen's Compensation Appeal Board, upon consideration of the testimony of the parties' medical experts, determined that a factual relationship between the work and the employment was not established and, therefore, denied benefits to those plaintiffs. The plaintiff in *Jarman* was found to have met his burden of proof. However, in *Hannula* and *Fiszer* the appeal board determined that the plaintiffs merely suffered from a debility as the consequence of pre-existing, non-work-related arteriosclerosis.

3. The scope of review in workmen's compensation cases is limited by the rule that findings of fact by the Workmen's Compensation Appeal Board are conclusive if supported by any of the evidence presented. The contested determinations in the instant cases were exclusively factual in nature. In each case the factual determination was supported by competent evidence.

### OPINION OF THE COURT

1. WORKMEN'S COMPENSATION — WORK-RELATED INJURY.

The workers' compensation law does not provide compensation for a worker afflicted by an illness or disease not caused or aggravated by his work or working conditions; nor is a different result required because debility has progressed to the point where the worker cannot work without pain or injury (MCL 418.301; MSA 17.237[301]).

2. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — HEART ATTACK.

Workmen's compensation cannot be awarded because the worker may suffer heart damage which would be work-related if he continued to work; unless the work has accelerated or aggra-

vated the illness, disease or deterioration and, thus, contributed to it, or the work coupled with the illness, disease or deterioration, in fact causes an injury, compensation is not payable (MCL 418.301; MSA 17.237[301]).

3. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — ARTERIOSCLEROSIS — HEART ATTACK.

Arteriosclerosis is an ordinary disease of life which is not caused by work or aggravated by the stress of work; however, work-related stress that would not adversely affect a person who does not have arteriosclerosis may cause a person with the disease to have a heart attack (MCL 418.301; MSA 17.237[301]).

4. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — ARTERIOSCLEROSIS — HEART ATTACK.

Workers suffering from arteriosclerosis who had not suffered heart damage, whatever the stress of the jobs, had no work-related injury because stress does not aggravate arteriosclerosis; although there was a causal relationship between the underlying disability, arteriosclerosis, and their inability to continue working, that disability was not caused and could not have been aggravated by their employment, and they were properly denied workmen's compensation benefits (MCL 418.301; MSA 17.237[301]).

5. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — HEART ATTACK.

A conclusion by the Workmen's Compensation Appeal Board that a worker's heart attack was a compensable injury is affirmed where there was evidence of stress in the employment and expert testimony related the stress to the heart damage, and where the opinion and findings by the appeal board were detailed and not conclusory (MCL 418.301, 418.861; MSA 17.237[301], 17.237[861]).

6. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — HEART ATTACK.

A conclusion by the Workmen's Compensation Appeal Board that there was a failure to prove that a worker's heart attack was a work-related injury must be affirmed where no evidence of stress or of the circumstances under which the claimant worked was offered and the expert witness for the claimant merely assumed that there was stress and gave his opinion based upon such assumptions (MCL 418.301, 418.861; MSA 17.237[301], 17.237[861]).

7. Workmen's Compensation — Work-Related Injury — Heart Attack.

Workmen's compensation may be awarded based on an assessment of the probabilities that job stress caused a heart injury in light of the background factual circumstances and any opinion testimony, although it is not possible to determine medically whether particular stress, *e.g.,* anxiety, anger, fear, exhilaration, fatigue, or the environment (air, heat, cold), caused a particular heart injury (MCL 418.301; MSA 17.237[301]).

8. Workmen's Compensation — Work-Related Injury — Heart Attack — Question of Fact.

The working and other conditions of a worker's life claimed to constitute the stress that assertedly led to a heart attack do not require medical testimony; anyone familiar with the facts can state them (MCL 418.301; MSA 17.237[301]).

9. Workmen's Compensation — Work-Related Injury — Heart Attack — Question of Fact.

The trier of fact is permitted to draw the natural inferences from all the evidence and testimony, lay and medical, in deciding whether there is the requisite relationship between the asserted stress and a claimed heart attack in workmen's compensation cases; opinions tentatively expressed may not on that account be discounted, nor may preclusive effect be given to medical testimony (MCL 418.301; MSA 17.237[301]).

10. Workmen's Compensation — Work-Related Injury — Burden of Proof.

The claimant in a workers' compensation case must show a reasonable relation of cause and effect between work and injury; other possible or probable causes of injury do not have to be excluded beyond doubt (MCL 418.301; MSA 17.237[301]).

11. Workmen's Compensation — Work-Related Injury.

The question in workers' compensation law is whether the injury accelerated a worker's death; whether, by reason of the injury suffered by him, his death occurred sooner than it probably otherwise would have (MCL 418.301; MSA 17.237[301]).

12. Workmen's Compensation — Workmen's Compensation Appeal Board — Findings of Fact.

The Workmen's Compensation Appeal Board is obliged to review *de novo* the decision of the hearing examiner; the primary function of the appeal board is that of finding what to it are the

controlling facts (MCL 418.255, 418.859; MSA 17.237[255], 17.237[859]).

13. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — HEART
ATTACK — FINDINGS OF FACT.

The Constitution and the Worker's Disability Compensation Act grant finality to the findings of fact of the Workmen's Compensation Appeal Board, not of a referee; the Workmen's Compensation Appeal Board, no less than the testifying experts, must examine and address the circumstances surrounding a worker's cardiac episode which suggest a causal link with his work (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).

14. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — FINDINGS
OF FACT — BURDEN OF PROOF — APPEAL AND ERROR.

A workers' compensation claimant need establish causality between his work and an injury only by the preponderance of the evidence; the Workmen's Compensation Appeal Board may conclude that a claimant has sustained the burden of proof when it is persuaded, viewing all the evidence, circumstances and reasonable inferences, that the evidence and inferences which support the claim outweigh those which oppose it, and a court may interfere with that judgment only when convinced that there is no evidence to support it (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).

15. WORKMEN'S COMPENSATION — WORKMEN'S COMPENSATION APPEAL
BOARD — FINDINGS OF FACT — APPEAL AND ERROR.

A decision of the Workmen's Compensation Appeal Board cannot be reviewed as a question of law unless its findings of fact are sufficiently detailed so that the Court can separate the facts the appeal board found from the law it applied; conclusory findings are inadequate because the Court needs to know the path the Workmen's Compensation Appeal Board has taken through the conflicting evidence, the testimony it has adopted, the standards followed and the reasoning used to reach its conclusion (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).

DISSENTING OPINION BY RYAN, J.

16. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — QUESTION
OF FACT.

*A claimant seeking workmen's compensation must establish both a personal injury and a "medical cause in fact" relationship between his employment and that injury; absent a showing of the requisite relationship, the injury cannot logically be said to*

*arise "out of and in the course of his employment" (MCL 418.301; MSA 17.237[301]).*

17. WORKMEN'S COMPENSATION — APPEAL AND ERROR — SCOPE OF REVIEW.

*The scope of a court's review in a workmen's compensation case is limited by the rule that findings of fact by the Workmen's Compensation Appeal Board are conclusive if supported by any of the evidence presented (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).*

18. WORKMEN'S COMPENSATION — WORK-RELATED INJURY — HEART ATTACK — QUESTION OF FACT.

*Findings of the Workmen's Compensation Appeal Board concerning the medical relationship, if any, of work-related stress to subsequent heart episodes of a worker are exclusively factual in nature; the appeal board's decision to award or deny benefits in such cases is affirmed on appeal if the appeal board's factual determination is supported by competent evidence (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).*

*Marcus, Ruck & Flynn* (by *Lawrence R. Backofen)* for plaintiff Kostamo.

*Kelman, Loria, Downing, Schneider & Simpson* (by *Rodger G. Will)* for plaintiff Bullard.

*Wisti & Jaaskelainen* (by *Gordon J. Jaaskelainen* and *James F. Tercha)* for plaintiffs Hannula and Fiszer.

*Gray & Taylor, P.C.,* for plaintiff Jarman.

*Clancey, Hansen, Davidson, Chilman & Graybill* for defendants Marquette Iron Mining Company and The Cleveland-Cliffs Iron Company.

*George E. Ganos* for defendants Copco Steel & Engineering and Employers Mutual Liability Insurance Company.

*Vairo, Mechlin, Tomasi & Johnson* for defendant White Pine Copper Company.

*Vandeveer, Garzia, Tonkin, Kerr & Heaphy, P.C.*
(by *James A. Sullivan)* for defendants Atlas Supply
Company and Michigan State Accident Fund.

Amici Curiae:

*Plunkett, Cooney, Rutt, Watters, Stanczyk &
Pedersen* (by *Jeannette A. Paskin)* for American
Insurance Association.

*Hayim I. Gross* and *Lacey & Jones* for Chrysler
Corporation, Uniroyal, Inc., Kelsey Hayes Com-
pany and Michigan Bell Telephone Company.

*William J. Devers, Jr.,* Associate Counsel, and
*Thomas P. Chuhran,* of counsel, for Ford Motor
Company.

*James A. Durkin* and *Thomas W. Watkins*
*(Frazer F. Hilder,* General Counsel, of counsel) for
General Motors Corporation.

*Jack H. Bindes* for Michigan Trial Lawyers As-
sociation.

*Kasoff, Young, Gottesman, Kovinsky, Friedman
& Walkon, P.C.,* for United Steelworkers of Amer-
ica.

LEVIN, J. In these consolidated cases the workers
had arteriosclerotic heart disease. Kostamo and
Bullard had heart attacks and died. Jarman had a
heart attack and lived. Fiszer and Hannula offered
expert testimony that they had suffered heart
attacks but the Worker's Compensation Appeal
Board found that they had not.

The WCAB denied compensation to all the
claimants except Jarman who, it found, had suf-
fered work-related heart damage and disability.

We affirm, except in *Kostamo,* which we remand for further proceedings.

## I

### A

In *Fiszer* and *Hannula,* the issue was whether they had suffered heart damage. The WCAB found that they had not and, therefore, did not reach the question whether the claimed heart damage was work-related.

The workers' compensation law does not provide compensation for a person afflicted by an illness or disease not caused or aggravated by his work or working conditions. Nor is a different result required because debility has progressed to the point where the worker cannot work without pain or injury. Accordingly, compensation cannot be awarded because the worker may suffer heart damage which would be work-related if he continued to work. Unless the work has accelerated or aggravated the illness, disease or deterioration and, thus, contributed to it, or the work, coupled with the illness, disease or deterioration, in fact causes an injury, compensation is not payable.

Arteriosclerosis is an ordinary disease of life which is not caused by work or aggravated by the stress of work. However, stress that would not adversely affect a person who does not have arteriosclerosis may cause a person who has that disease to have a heart attack.

The WCAB found that Fiszer[1] and Hannula[2] had not suffered heart damage. Those findings are

---

[1] Jan Fiszer was employed by the White Pine Copper Co. For seven years he was a lube man. This work required him to perform extensive, strenuous work on machinery. In May, 1970 he experienced pain in the chest while at work. His physician, Dr. Archibald, ordered him to cease work. In October, 1971, after a 17-month disablement, he returned to work as a hooker. This job required him to lift steel pipes,

plates, boxes and supplies to a truck hoist. On January 28, 1972, he again suffered pains in the chest. After this experience he was told to work no more. At the time Fiszer was 46 years old.

The hearing referee granted compensation. The WCAB reversed.

The WCAB carefully reviewed five doctors' testimony. It noted that claimant's experts, Drs. Archibald and Young, posited a myocardial infarction, an injury to the heart muscle. It noted the absence of test support substantiating a myocardial infarction. Dr. Archibald and Dr. Young recognized, and the reports of three other doctors confirmed, that three electrocardiograms taken of Fiszer revealed no infarction. Drs. Archibald and Young relied on Fiszer's having experienced severe distress at work and said that myocardial infarctions do not always appear in electrocardiograms taken some time after the incident.

It was for the WCAB to decide, in light of the conflicting medical testimony, the purely medical dispute whether Fiszer had a heart attack.

[2] Paul Hannula was employed by the Cleveland-Cliffs Iron Co as a stope scraperman until August 19, 1971, when he was advised by doctors to discontinue work. His job included operating an electric tugger (a digging instrument), using a bar to poke holes in the face of the mine, carrying explosives and coils of rope, and occasionally carrying and using a drill weighing approximately 60 pounds. Hannula testified that he first experienced chest pains in June, 1971. He was examined by his family physician. Six weeks later he was advised by his doctor to discontinue work.

The hearing referee granted compensation. The WCAB reversed.

Hannula had arteriosclerosis prior to his disablement. The WCAB's opinion addresses the issue "whether his work aggravated that condition to disability (i.e., worsened the condition, or simply caused transient angina pains)". See MCL 418.401(c); MSA 17.237(401)(c).

The WCAB's opinion reviews the testimony of two examining internal medicine specialists, Dr. Irving Young for the claimant, and Dr. K. Charles Wright for the defendant. Dr. Young testified that the electrocardiogram taken both at rest and after exercising was normal and revealed no heart damage. Nevertheless he concluded on the basis of the history of two episodes of prolonged chest pain that Hannula "almost surely" suffered myocardial necrosis; that is, myocardial infarction. "These episodes occurred during the stress of work, and I feel, therefore, they are work related." Dr. Young went on to state that the underlying arteriosclerosis was unrelated to the work experience.

Dr. Wright said that there was no indication from the electrocardiogram or the clinical history that Hannula had suffered a myocardial infarction and went on to explain the basis for his opinion:

"Q. But I take it you found nothing in your examination of this man or in his history to make you think there had been an aggravation?

"A. He did not give me a history which was typical of this. A patient who has had a heart attack would be sweating, they are pale; they would be weak.

"Q. He did not have this?

supported in the evidence. Therefore, whatever the stress of the jobs, there was no injury. Since stress does not aggravate arteriosclerosis, the WCAB decisions denying them compensation must be affirmed. Although there is a causal relationship between the underlying disability, arteriosclerosis, and Fiszer's and Hannula's inability to continue working, that disability was not caused and could not have been aggravated by their employment.

## B

In *Kostamo, Bullard* and *Jarman,* where the workers had heart attacks, the issue was whether the work was a cause of the heart damage. The WCAB found that it was a cause in *Jarman* but not in *Kostamo* and *Bullard.*

In *Kostamo,* the WCAB adopted the expert testimony offered by the employer that Kostamo's heart attack was "inevitable". In *Bullard,* it found that there was no evidence that the attack was caused by stress. In *Jarman,* where it concluded that there was a compensable injury, it found that there was evidence of stress in the employment and adopted the expert testimony offered by Jarman relating the stress to his heart damage.

We affirm in *Jarman* because there was evidence of job stress and Jarman's expert witness related the stress to the heart damage. The WCAB's opinion and findings are detailed and not conclusory.

"*A.* He did not give me a history of that when I was talking to him.

"*Q.* Is there any significance to obtaining relief through nitroglycerin tablets [as was testified to by Hannula]? I mean, does that assist in differentiating between garden variety angina pectoris and some degree of infarct?

"*A.* Usually if you have a degree of infarct you have less or no relief from the nitroglycerin, yes. This helps some, the duration of pain and whether they are perspiring. * * *"

As in Fiszer, it was for the WCAB to resolve the factual issue created by the conflicting medical testimony.

In *Bullard,* no evidence of stress or of the circumstances under which he worked was offered. The expert witness for Bullard's widow assumed that there was stress and gave his opinion based upon such assumptions. There being no evidence that in fact there was stress or of its nature, he could not relate his opinion to actual job stress. The WCAB's conclusion that there was a failure to prove a work-related injury must be affirmed.

## C

The WCAB's sketchy and conclusory opinion adopting the expert testimony offered by the employer that Kostamo's heart attack was inevitable raises as many questions as it answers, and is so inadequate that we remand for further proceedings and findings.

While a heart attack may be inevitable in the sense that the victim will some day have a heart attack, such a statement begs the question whether job stress caused the attack to occur when it did or aggravated the attack and the extent of damage. Although workers' compensation is not payable for the ordinary diseases and infirmities of life, it is payable for work-related acceleration and aggravation of such diseases and infirmities.

Doctors look for the etiological or medical cause; lawyers look for the legal cause. Generalities, such as "inevitable", which may express no more than the medical view of causation, do not assist a trier of fact or reviewing court in deciding whether there is legal causation such that compensation is payable.

In the present state of medical knowledge, we know that stress can cause a heart attack, and that persons who have arteriosclerosis are more

likely to suffer heart attacks as a result of stress than those who do not. The stresses that may cause attacks include anxiety, anger, fear, exhilaration, fatigue, and the environment (air, heat, cold).

We know also that is not possible to determine medically whether particular stress caused a particular injury. Nevertheless compensation may be awarded based on an assessment of the probabilities in light of the background factual circumstances and any opinion testimony. Opinions tentatively expressed may not on that account be discounted. The certainty, or puffery, with which experts express their opinions may mask differing understandings of the factual background and views regarding causation. The answer is to be found in careful scrutiny of the factual background and not in terminology and emphasis. Nor may preclusive effect be given to medical testimony.

Where the issue, as in *Kostamo, Jarman* and *Bullard,* is whether job stress caused the injury, there are two inquiries, one factual and the other judgmental.

The factual inquiry concerns the working and other conditions of the worker's life claimed to constitute the stress that assertedly led to the heart attack. The judgmental question is whether the asserted stress did cause the heart attack.

The factual question clearly does not require medical testimony. Anyone familiar with the facts can state them. In *Kostamo* and *Jarman* there was testimony of factual circumstances indicating stress, while in *Bullard* none was offered.

Nor is the judgmental question entirely the province of the medical profession. The trier of facts is permitted to draw natural inferences from

all the evidence and testimony, lay and medical, in deciding whether there is the requisite relationship between the asserted stress and the claimed heart attack.

## II

In *Kostamo* and *Jarman* the factual background regarding the asserted stress was fully developed, while in *Bullard* it was not:

### A

Onnie T. Kostamo, 62 years old, worked the night shift (approximately 11:30 p.m. to 7:30 a.m.) for the Marquette Iron Mining Company, which had employed him for more than 20 years. His job was to maintain the kiln discharge area.

Kostamo's primary duty was to remove chunks of iron ore which missed the storage hopper as they dropped from the kiln. Failure to keep the area clear would require the shut-down of operations. In removing the chunks, which weighed up to several hundred pounds, Kostamo operated a tractor-shovel.[3]

During the occasional periods when no chunks were dropping out of the kiln Kostamo was responsible for hosing down the floor and emptying dust valves on the cooler.

Kostamo's area of responsibility was a room approximately 10 × 15 feet adjacent to the kiln. The atmosphere of the room was hot and dusty (sufficiently dusty to require a shower before leav-

---

[3] The diesel tractor-shovel was equipped with a scrubber, power steering and automatic transmission. The hydraulic shovel was controlled by two levers. To mount and dismount, Kostamo had to climb approximately four feet over the tire.

ing work).[4] Small, hot pellets occasionally fell from the kiln striking Kostamo.

Kostamo arrived at work for the night shift on May 20, 1968 in apparent good health. Although Kostamo had arteriosclerosis, it was undetected at the time. At around 1 a.m. Kostamo complained of not feeling well. Kostamo stated that he had pains in the chest and down the left arm as well as difficulty breathing. Nevertheless, after resting briefly, Kostamo returned to work. At 4 a.m., Kostamo again suffered the same physical distress but returned to work. Finally, at 6 a.m., Kostamo suffered another episode of distress. Incapable of continuing work, Kostamo was driven to a hospital in his car.[5] Upon arrival at the hospital, Kostamo could walk under his own power but was incapable of signing himself in. He died in the hospital 12 days later on June 2, 1968 of an apparent heart attack.[6]

## B

Jack Jarman was a truck driver and delivery man for the Atlas Supply Co. In the early morning hours of December 30, 1972, while at home, Jarman suffered severe pain in the chest. He asserts that the myocardial infarction which disabled him and prevents his return to full-time strenuous work was a result of the mental and physical strain of his employment.

---

[4] The tractor-shovels were equipped with respirators.

[5] Kostamo refused an ambulance and insisted on being driven to the hospital in his own automobile. A kiln in another area of the plant was under repair that night.

[6] Kostamo was treated as an acute coronary case from the time of admission. The death certificate indicates that the immediate cause of death was acute myocardial infarction as a consequence of arteriosclerosis. No autopsy was performed.

On Wednesday, December 27th, Jarman had worked 19 hours delivering bags of material to drilling sites. The delivery involved loading and unloading, with another employee, at least in part by hand, bags weighing from 30 to 100 pounds. Although he returned home at 3 a.m. on December 28th, he resumed work Thursday morning at 8 a.m. and worked eight hours, again loading and unloading. On Friday, Jarman worked nine hours performing similar tasks.

Jarman testified that as the senior employee he felt responsible for the efficient operation of the yard. He frequently was pressed into duty when other employees had failed to complete their tasks. The nature of the business required that he be on call 24 hours a day, seven days a week. The seriousness with which Jarman regarded his responsibility was corroborated by Mrs. Jarman's testimony, who stated that he became extremely distressed when operations did not proceed smoothly. This was further supported by the testimony of George Clapp, manager of Atlas Supply Co.

## C

Clarence Bullard died while driving a truck for defendant Copco Steel & Engineering. Bullard had a long history of heart trouble. While driving what was described as a large truck on I-75 in the early morning hours his truck veered off the road, into the median, and struck a divider. Bullard died moments after the truck came to rest. The two witnesses to the accident, a passenger and the driver of a car approaching from the opposite direction, saw Bullard slumped over the wheel as

the vehicle was crossing into the median.[7] It was claimant's theory that the stress of driving the truck precipitated or aggravated his underlying arteriosclerotic condition and resulted in a fatal heart attack.

The WCAB examined the medical testimony and noted that defendant's expert was of the opinion that the cause of death was occlusion of the coronary artery, which is not related to stress. The WCAB, however, did not decide the case on that basis. Rather, it held that the claimant failed to carry the burden of proof in establishing her theory of recovery. The WCAB analyzed the circumstances underlying the opinion of claimant's expert who asserted that a relationship existed between the decedent's employment and the fatal heart attack.

"An examination of Dr. Johnson's testimony to this juncture is of little probative value. He testified that a man with a history of congestive heart failure could have expired while lying in bed or in a seated position. Further, the doctor emphasized that decedent was under physical or emotional stress. *The record is barren of evidence that plaintiff was under stress.* In fact, the record is barren of this significant information: the exact size of the truck cab, the method of operating the unit, the type of trailer, the contents of the trailer, and if decedent loaded or unloaded a trailer unit before his death.

\* \* \*

[7] The witnesses said that Bullard "straightened himself up for a few minutes, then he careened into a guard rail and went over". It is unclear whether this testimony refers to the straightening up of the truck which they had noted veered directly off the road and left no skid marks or to Bullard's position in the truck. In any event, the WCAB could properly attach little weight to that testimony.

There was evidence to indicate the absence of stressful conditions. The two eyewitnesses testified that weather conditions were good and that there was no traffic other than the truck and their own vehicle on the road at the time.

"The burden was on plaintiff's decedent *[sic]* to show causal relationship between work activity, however slight, and the death. This was not done." (Emphasis supplied.)

## III

### A

In *Zaremba v Chrysler Corp,* 377 Mich 226, 231; 139 NW2d 745 (1966), the Court declared that compensation was payable for work-related heart damage without regard to whether there was unusual exertion before the attack:

" 'Notwithstanding anything we may have said in prior cases, we hold that an accidental injury arises out of the employment when the required exertion producing the injury is too great for the person undertaking the work, *whatever the degree of exertion or the condition of his health,* provided the exertion is either the sole or a contributing cause of the injury. In short, that an injury is accidental when either the cause or result is unexpected or accidental, *although the work being done is usual or ordinary.'* " (Emphasis added by that Court.)[8]

Medical theory appears to be unanimous that work-related stress can precipitate or aggravate

[8] The problem of pre-existing disease or condition was addressed in an earlier case:

"Nothing is better settled in compensation law than that the act takes the workmen as they arrive at the plant gate. Some are weak and some are strong. Some, particularly as age advances, have a pre-existing 'disease or condition' and some have not. No matter. All must work. They share equally the hazards of the press and their families the stringencies of want, and they all, in our opinion, share equally in the protection of the act in event of accident, regardless of their prior condition of health." *Sheppard v Michigan National Bank,* 348 Mich 577, 584; 83 NW2d 614 (1957).

cardiac injury.[9] The Legislature has, for certain occupations, created a presumption that a relationship between employment and cardiac injury exists.[10] This Court has approved recovery under the workers' compensation law for heart injury caused by job-related stress.[11] We do not add to or disturb those precepts, but, rather, address matters of proof.

In a workers' compensation case, "[t]he claimant must show a reasonable relation of cause and effect between work and injury. Other possible or probable causes of injury do not have to be excluded beyond doubt". *Kepsel v McCready & Sons,* 345 Mich 335, 343-344; 76 NW2d 30 (1956). The employment need not be the sole cause; it is enough if it contributes to the injury. See *Swanson v Oliver Iron Mining Co,* 266 Mich 121, 122; 253 NW 239 (1934).[12]

Medical testimony in the context of compensation proceedings for cardiac injuries often encounters special difficulties. Cross-pollination of medical and legal concepts of causality can confuse the ultimate issue and obscure the function of the fact finder.

---

[9] "It is well established that at times physical activity, while not causing the primary heart disease, may precipitate acute congestive heart failure and/or acute ischemic episodes. The ischemia can precipitate angina pectoris or a dysrhythmia, perhaps a fatal one." American Heart Association, Report of the Committee on Stress, Strain and Heart Disease, p 4. Reprinted from 55 *Circulation* (No 5, May, 1977).

[10] MCL 418.405; MSA 17.237(405), establishes a presumption that respiratory and heart diseases manifesting themselves during the active service of policemen and firemen are "deemed to arise out of and in the course of employment in the absence of evidence to the contrary".

[11] See, *e.g., Zaremba v Chrysler Corp,* 377 Mich 226; 139 NW2d 745 (1966), and *Mottonen v Calumet & Hecla, Inc,* 360 Mich 659; 105 NW2d 33 (1960). See, also, McNiece, Heart Disease and the Law (Englewood Cliffs, NJ: Prentice-Hall, Inc, 1961), p 17, noting nationwide acceptance of the proposition that physical strain can "cause" cardiac disability or death.

[12] See, also, *Fergus v Chrysler Corp,* 389 Mich 811 (1973).

Doctors and lawyers approach the problem of cause from different perspectives. It has been said: "Medically, 'the cause' may be considered that activity or agent without which a condition would not have appeared. From the legal point of view, if some factor or element plays a role in bringing about a result sooner than ordinarily would be expected, it may be considered 'a' cause for which legal liability may accrue."[13]

The medical assessment of causality in heart cases is complicated by the many factors involved in the causation and progression of an individual's cardiac disorder.

"The physician's evaluation of causality in heart disease is further influenced by the fact that, when considered over the expected course of the underlying cardiac disease process, the specific incident or trauma for which there may be legal liability often was of relative unimportance. * * *

"Along the same line of reasoning, the physician's assessment of causation in heart conditions is affected to a large extent by the fact that in many instances the amount of acceleration of the underlying disease process alleged to have been produced by the incident or trauma under consideration was, when measured over the life span of the underlying disease, inconsequential and insignificant. * * *

"Finally, the physician's concept of causality is influenced to a large extent by the fact that in many instances the alleged incident or trauma, particularly those involved in workmen's compensation considerations, was not unique and that if the patient had not encountered this incident at work, he would have met or been subjected to similar stresses or strains at home or at recreation." Sagall, *Heart Disease and the Law—*

---

[13] AHA Report, *supra,* p 5.

See Small, *Gaffing at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation,* 31 Tex L Rev 630 (1953).

*Medico-Legal Considerations of Causality,* 30 Tenn L
Rev 517, 523-524 (1963).

By contrast, the idea that a relatively insignifi-
cant factor may be characterized as causative and
significant liability attach to that determination is
deeply rooted in the law. Prosser has stated that a
person who injured another, "even by so much as
a cut on the finger, becomes liable for all resulting
harm to the person, although it may be death".[14]
As in the traditional textbook case of the hypo-
thetical plaintiff with an egg-shell skull, it is im-
possible to determine how long Kostamo could
have avoided injury absent the alleged precipitat-
ing event. In workers' compensation law, "[t]he
question is whether the injury accelerated his
death; whether, by reason of the injury suffered by
him, his death occurred sooner than it probably
otherwise would". *Swanson v Oliver Mining Co,
supra,* p 122.[15]

The different theoretical orientation of the medi-
cal profession with regard to cause is evident in
the testimony of Dr. Rosenbaum, defendant's ex-
pert witness. When asked whether the nature of
Kostamo's work was such as could precipitate
cardiac injury in a person having arteriosclerosis,
he responded:

"Well, I think that the myocardial infarction which
Mr. Kostamo had, as indicated before, was due to

[14] Prosser, Law of Torts (4th ed), pp 261-263.

[15] See, also, McNiece, *supra,* p 12:

"[T]he courts are not talking of causation in an etiological sense but
rather of aggravation, acceleration, or 'lighting up.' Unlike the medi-
cal profession, the courts are not concerned with the degree of
impairment which may lurk beneath the surface appearances of a
man. Their inquiry is not directed to the undoubted existence of the
chronic and longstanding features of cardiac impairments, but rather
to the fact that the work contributed, at least in some slight measure,
to bring those impairments to light."

underlying coronary arteriosclerosis. I think that the disease present in the coronary arteries had been present for some months or years. It had undergone a natural progression, and it had reached the point where it was inevitable that he was going to have a myocardial infarction."

In discussing the causal relationship between Kostamo's employment and his subsequent fatal heart attack, the board relied almost entirely on Dr. Rosenbaum's opinion that the fatal heart attack was inevitable:

"As to any causal relationship between the work done on the night in question and the subsequent fatal heart attack, Dr. English was of the opinion that there was only a 'possibility.' In contrast, Dr. Rosenbaum was very emphatic in his opinion that the ultimate heart attack was 'inevitable,' because the underlying coronary arteriosclerosis had undergone a natural progression to the point of inevitability.

"An experienced referee heard all the witnesses, evaluated the medical proofs and was equally emphatic in his opinion that the decedent's heart attack was 'in no way' work-connected.

"Upon a careful review of the file we find that the referee's decision is amply supported by the evidence and it does not contain any grounds for reversal of his findings."[16]

The American Heart Association's Committee on Stress, Strain and Heart Disease, in a report approved by the Steering Committee for Medical and Community Programs on December 10, 1976, said:

"Deficiencies in present day medical knowledge and diagnostic studies *often prevent,* in individual cases,

[16] However emphatic the referee's opinion may have been, as previously indicated it consisted of one sentence with no explanatory reference to the proofs adduced.

*precise medical definition of pathology, pathophysiologic
mechanisms which lead to a result,* the time of onset of
certain lesions, the sequence in which the lesions devel-
oped, *and the precise effect of the stimulus under
scrutiny.* However, because such causality assessments
are necessary for medical and legal purposes they have
to be made even though based on probability, or reason-
able inference.

"*In most instances, the nature of the heart disorder*
found by clinical or pathological studies *does not by
itself indicate whether or not some specific stress did
play a precipitating or contributory role in its develop-
ment* or whether the disorder resulted solely from the
natural and expected progression of the underlying
disease. Such determination, in large part, *must be
made by analysis of the circumstances surrounding the
occurrence* of the pathology found." (Emphasis sup-
plied.)[17]

In *Kostamo* the WCAB made no attempt to
relate the circumstances surrounding his heart
attack, developed through lay testimony, to the
medical testimony. The WCAB can, with the as-
sistance of medical experts, identify discrete fac-
tors which suggest causality. Factors which have
been regarded as significant by courts and com-
mentators were not evaluated by the WCAB. Tem-
poral proximity of the cardiac episodes to the work
experience,[18] the hot and dusty conditions of em-
ployment,[19] the repeated return to work after each
episode[20] and the mental stress[21] to which Kostamo

---

[17] AHA Report, *supra,* p 5.

[18] See McNiece, *supra,* pp 17-18.

[19] *Id.,* pp 39-41.

[20] Professor Larson has declared:

"The most obvious relevance of this element is in showing causal
connection between the obligations of the employment and the final
injury; for if the workman, for some reason, feels impelled to continue
his duties when, but for these duties he could and would have gone
somewhere to lie down at once, the causal contribution of the employ-
ment to the aggravation of the condition is clear." 1B Larson, Work-
men's Compensation Law, § 38.64(c), p 7-145.

[21] See McNiece, *supra,* pp 30-31.

was subjected are potentially significant factors in the causal equation and were not even adverted to by the WCAB in its brief and conclusory opinion.

We do not suggest that any or all of these factors should always be, or, are here, dispositive. Rather, we hold that the WCAB erred in giving preclusive effect to the *conclusion* of a medical expert and in failing to treat facts developed in lay testimony.

While medical testimony may be helpful, even, ultimately, decisive, the trier of fact is obligated to consider all the testimony in determining legal causation.[22] Lay testimony may not be ignored

---

[22] The American Heart Association recommends an "analysis of the circumstances surrounding the occurrence of the pathology found", and that a series of questions be answered:

"Coronary heart disease is usually present for years before it is clinically identified. There are many conditions which may influence the development of this disease, and/or make it clinically evident. Medical opinions by well-qualified physicians may vary, depending upon which of the many factors are emphasized in considering causal relationships. This variation of medical opinion may be minimized if (1) the opinions are based upon generally accepted current medical knowledge and (2) as many details of the specific case as possible are available.

\* \* \*

"The variations in individual response to a given stress or stimulus preclude specific guidelines or causality criteria covering all situations. Each case must be evaluated individually, in the light of all available medical data, including clinical observations, laboratory studies, electrocardiographic and X-ray findings. Based upon these data, a careful reconstruction must be made of the sequence of events likely to have occurred. The stress or stimulus under consideration as a possible etiologic or worsening agent must be fully identified. Whenever the causality assessment involves death, an autopsy should be performed. It must again be emphasized that such assessment, to be medically valid, must be consistent with current medical thinking.

"The medical acceptance of a causal relationship between a specifically identified stress or stimulus and a given cardiac abnormality requires as a minimum that the following be accomplished:

"1. A diagnosis of the specific cardiac lesion, disorder or dysfunction must be established and confirmed as fully as possible by objective means. The following questions must be answered:

"a. Does the patient have heart disease and, if so, what is the complete and specific medical diagnosis? What is the degree of func-

when considering the causal connection between employment and a heart attack.

In *Sentilles v Inter-Caribbean Shipping Corp,* 361 US 107, 109-110; 80 S Ct 173; 4 L Ed 2d 142 (1959), the United States Supreme Court addressed the role of medical testimony in an action for compensation under the Jones Act:[23]

"The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that

tional impairment? What are the autopsy findings, if death has occurred?

"b. Did the patient have heart disease prior to exposure to the identified stress; if not, when did evidence of heart disease first appear?

"c. What is the nature of the stress or exposure under consideration as a possible causative element?

"d. Did the patient's heart condition change after the stressful event? If there was a change, when was this change apparent and documented? Was this change more than the 'natural course of the disease?' Was this change temporary or permanent?

"2. The stimulus or stress claimed to have caused cardiac injury, disability or death must be described as fully as possible.

"a. Physical stress can usually be measured in absolute terms, and its effects depend upon the physical and emotional condition of the person involved, as well as upon environmental factors.

"b. Emotional stress is less readily measurable and the effects depend upon the emotional and physical state of the individual at the time of exposure.

"In evaluating emotional stress, it frequently is difficult to determine the relative importance of one specifically identified stress, or to select one emotional stress over another (work related? family related?).

"3. The time interval between exposure to a given stimulus and the development of a cardiac lesion or heart dysfunction must be compatible with current scientific concepts of the mechanism of disease production." AHA Report, *supra,* pp 5-6.

An expert tribunal, as well as doctors, is capable of answering many of these questions through an examination of the circumstances surrounding the event.

[23] The jury had entered a verdict for the plaintiff on his theory that the accident activated or aggravated the previously latent tubercular condition. The Court of Appeals reversed on the ground that the evidence did not justify the jury's conclusion that the accident caused the illness.

accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony, into consideration."

The Second Circuit has extended this view of medical testimony to heart attack compensation cases under the Jones Act. Noting that "[t]he idea that proximate cause between an internal human physical condition and external stimuli cannot be established except by the testimony of a medical witness was expressly rejected by the Supreme Court in *Sentilles*", the court, in *Wilkins v American Export Isbrandtsen Lines, Inc*, 446 F2d 480, 483 (CA 2, 1971), held that it was error for the district judge to withdraw from jury consideration lay testimony with respect to the issue of whether work had caused a heart attack:

"It was error to withdraw from the jury the evidence of Wilkins' overtime work during the period from the collision to October 3. The jury was entitled to have this broader basis for an evaluation of the cause of the decedent's heart muscle spasm. It was not bound by the perimeter of expert testimony but rather was entitled to substitute its own practical judgment for that of the expert. The fact that the question put to the doctor is the kind which cannot be answered on the basis of empirical knowledge or with scientific accuracy, does not mean that a jury's answer to it would be irrational. They were not bound to stay on a scientific platform."

In *Hudson v Owens,* 439 SW2d 565, 569 (Ky, 1969), the Kentucky Court of Appeals, in affirming a denial of compensation for a heart attack, held that unanimous supportive expert medical testimony could be rejected:

"It seems to us that the job of the medical witness is to testify to the presence or absence of causation from the medical standpoint, and it is the job of the board to declare whether or not, considering the medical evidence and the other relevant factors present, the situation of a work-connected injury is present. See McNiece, Heart Disease and the Law, pp 128-138.

"The medical evidence, although relevant and material, must be considered not as determinative but rather as part of the totality of circumstances upon which the board must make the factual determination of whether or not the work-connection was de minimis and the cardiac disability merely coincidental with rather than caused by the work-connected event."

Although we are not faced with the question, we note that courts have held that a prima facie case for compensation because of a heart attack may be established without medical testimony.[24]

[24] See, for example, *Industrial Commission v Havens,* 136 Colo 111; 314 P2d 698 (1957); *Crescent Wharf & Warehouse Co v Cyr,* 200 F2d 633 (CA 9, 1952); and *Adelaide Stevedoring Co, Ltd v Forst,* 64 Commonwealth L Reports 538, 563 (Australia, 1940).

This view was well stated in the opinion of Rich, A.C.J., in *Adelaide Stevedoring Co, Ltd v Forst, supra,* p 563, where the Australian High Court affirmed an appellate reversal of a denial of compensation in a heart attack case:

"I do not see why a court should not begin its investigation, i.e., before hearing any medical testimony, from the standpoint of the presumptive inference which this sequence of events would naturally inspire in the mind of any common-sense person uninstructed in pathology. When he finds that a workman of the not-so-young standing attempts in a posture calculated by reason of the pressure on the stomach to disturb or arrest the rhythm of the heart a very strenuous task not forming part of his ordinary work and then collapses almost immediately and dies from a heart condition, why should not a court say that here is strong ground for a preliminary presumption of fact in favour of the view that the work materially contributed to the

## B

In *Kostamo* the WCAB spoke of the "experienced referee [who] heard all the evidence". Putting aside that the medical testimony was on deposition, the WCAB is obliged to review *de novo* the decision of the hearing examiner. "The primary function of the appeal board is that of finding what to it are the controlling facts." *Koschay v Barnett Pontiac, Inc,* 386 Mich 223, 230; 191 NW2d 334 (1971). The Constitution and the statute grant finality to the findings of fact of the WCAB, not of *a* referee. The WCAB, no less than the testifying experts, must examine and address the circumstances surrounding the cardiac episode which suggest a causal link.[25]

A claimant need establish causality only by a preponderance of the evidence. The WCAB may conclude that the party who has the burden of proof has produced evidence which preponderates when it is persuaded, viewing all the evidence, circumstances and reasonable inferences, that the evidence and inferences which support the claim outweigh those which oppose it. Whether the evidence so persuades and therefore preponderates is a judgment confided to the WCAB with which a court may interfere only when convinced that

cause of death? From this standpoint the investigation of physiological and pathological opinion shows no more than the current medical views find insufficient reason for connecting any coronary thrombosis with effort. Be it so. That to my mind is not enough to overturn or rebut the presumption which flows from the observed sequence of events. If medical knowledge develops strong positive reasons for saying that the lay common-sense presumption is wrong, the courts, no doubt, would gladly give effect to this affirmative information. But, while science presents us with no more than a blank negation, we can only await its positive results and in the meantime act on our own intuitive inferences."

[25] *DeGeer v DeGeer Farming Equipment Co,* 391 Mich 96, 101; 214 NW2d 794 (1974).

there is no evidence to support that judgment.[26]

In a number of cases we have emphasized that we cannot review a decision of the WCAB as a question of law unless its findings of fact are sufficiently detailed so that we can separate the facts it found from the law it applied, and that conclusory findings are inadequate because we need to know the path it has taken through the conflicting evidence, the testimony it has adopted, the standards followed and the reasoning used to reach its conclusion.[27]

## C

Dr. English, Kostamo's medical expert, stated that Kostamo's work "could have", "might have", "possibly" precipitated or aggravated Kostamo's heart attack. Dr. Rosenbaum, defendant's expert, stated positively that Kostamo's work "did not play a role in the production of his attack, nor in his subsequent death * * *".

In reviewing this testimony the WCAB apparently placed critical importance on the comparative certainty with which the doctors expressed themselves.

Dr. English's failure to state a medical opinion with certainty reflects the current status of scientific knowledge, not a lack of merit in the claim-

---

[26] See *Aquilina v General Motors Corp,* 403 Mich 206, 210-212; 267 NW2d 923 (1978).

[27] *DeGeer v DeGeer Farming Equipment Co, supra,* pp 100-101; *Steel v Suits News Co,* 398 Mich 171, 177; 247 NW2d 284 (1976); *Braxton v Chevrolet Grey Iron Div, General Motors Corp,* 396 Mich 685, 694; 242 NW2d 420 (1976); *Harrison v Tireman & Colfax Bump & Repair Shop,* 395 Mich 48, 50; 232 NW2d 274 (1975); *McAvoy v H B Sherman Co,* 401 Mich 419, 468; 258 NW2d 414 (1977) (COLEMAN, J., dissenting); *McClary v Wagoner,* 16 Mich App 326, 328; 167 NW2d 800 (1969); see, also, *Leskinen v Employment Security Commission,* 398 Mich 501, 509; 247 NW2d 808 (1976); *Beebee v Haslett Public Schools,* 401 Mich 954 (1977).

ant's position.[28] "The matter does not turn on the use of a particular form of words by the physicians in giving their testimony." *Sentilles, supra,* p 109.[29] The law does not place on claimants the impossible burden of proving with certainty that work-related stress contributed to their cardiac disorder.[30]

In *Jarman* the WCAB rejected the suggestion that Jarman's expert's testimony was of little probative value because his opinions were expressed tentatively. We agree. The manner in which a doctor's opinion is expressed is not determinative of its probative value.

The WCAB in *Jarman* does not appear to have granted preclusive effect to a medical conclusion, as it did in *Kostamo.* The bulk of the opinion is devoted to a detailed examination of the circumstances surrounding Jarman's heart attack underlying the expert's opinion. The WCAB's review of the testimony—the difficult work schedule, time pressures, physical labor and sense of responsibility under which Jarman labored—adequately support *its* conclusion that work-related physical and emotional stress existed and contributed to Jarman's heart attack.

In *Jarman* the WCAB related the medical testimony to the factual background. In *Kostamo* it did not; we are presented only with a conclusion.

[28] See *Yates v Wenk,* 363 Mich 311, 314-315; 109 NW2d 828 (1961).

See, also, Martin, *The Uncertain Rule of Certainty: An Analysis and Proposal for a Federal Evidence Rule,* 20 Wayne L Rev 781, 797-808 (1974).

[29] See *Sondag v Ferris Hardware,* 220 NW2d 903, 907 (Iowa, 1974):

"The very nature of opinion evidence deprives it of the quality of absolute certainty. If it had the quality, it would not be an opinion. *Shepard v Carnation Milk Co,* 220 Iowa 466; 262 NW 110, 114 (1935). The opinion of experts need not be couched in definite, positive or unequivocal language. *Dickinson v Mailliard,* 175 NW2d 588, 593 (Iowa, 1970)."

[30] See 3 Larson, *supra,* § 80.32, pp 15-429 and 15-430.

Because of the differing terminology of doctors and lawyers, conclusory statements concerning causation should be rejected by the WCAB, and their uncritical adoption, without examination or relation of the facts to the conclusion, should be rejected by the appellate courts.

It is for the foregoing reasons that we affirm *Jarman* and vacate the WCAB's opinion in *Kostamo* and remand to it for further proceedings and detailed findings of fact on the issue whether his heart attack was caused or aggravated by stressful working conditions.

We affirm *Bullard, Fiszer* and *Hannula.*

KAVANAGH, WILLIAMS, and BLAIR MOODY, JR., JJ., concurred with LEVIN, J.

RYAN, J. We granted leave in these workers' compensation cases and directed that they be argued and submitted together because each concerns a problem which we perceive to be of importance to the law of workers' compensation.

Each of the cases presents a single factual issue: whether the plaintiff established a *medical causal relationship* between the physical, mental or emotional stress encountered in his employment and a subsequent industrially disabling injury. The facts in the cases are as follows:

## *Kostamo v Marquette Iron Mining Company*

Onnie Kostamo was employed by the defendant, Marquette Iron Mining Company, for about 20 years. At the time of the incident in question, his job consisted of operating a front-end loader. On the morning of May 21, 1968, while working his regular shift, Mr. Kostamo experienced two or three episodes of what he called "heart attack

symptoms," and eventually was taken to a hospital where he died seven days later at the age of 63.

A claim for compensation was filed. The medical testimony at the hearing indicated that Kostamo suffered from pre-existing arteriosclerosis, essentially a natural degenerative condition marked by the loss of elasticity, thickening and hardening of the arteries.

The medical experts who testified did not dispute the fact that the work performed over the years did not produce the underlying disease, arteriosclerosis; rather they disagreed as to whether Mr. Kostamo's work on the night of the three heart episodes could have been a factor in precipitating the "heart attack" by aggravating the underlying pathology.

Dr. English, testifying for the plaintiff, opined that the attack might not have occurred as soon as it did or might not have occurred at all if Mr. Kostamo had not continued to work in the face of the previous episodes of "heart attack symptoms" that evening.

In contrast, defendant's expert, Dr. Rosenbaum, testified that considering the circumstances, including the underlying disease and the degree of Mr. Kostamo's activity on the night in question, there was no relationship between stress from the employment and the subsequent heart attack. Essentially, Dr. Rosenbaum maintained that the coronary failure had been inevitable for some time and the circumstances surrounding it were merely coincidental. He testified, in addition, that to maintain that the work circumstances played any significant role in precipitating the heart attack was mere speculation.

The hearing referee determined that the heart attack which the decedent sustained was in no

way related to his employment with the defendant. That determination was affirmed by the Worker's Compensation Appeal Board.

## Bullard v Copco Steel & Engineering

At the time of his death, Clarence Bullard was a truck driver for the defendant, Copco Steel and Engineering. On March 1, 1970, Bullard was driving his truck northbound on I-75 near Vandalia, Ohio. Testimony indicated that the truck left the northbound lanes, crossed the median, crossed both southbound lanes and came to rest at the bottom on an embankment after striking the guardrail on the west side of the highway.

Evidence obtained through an autopsy indicated that the cause of death was cerebral anoxia, as a consequence of an acute myocardial infarction caused by the complete occlusion of the left descending coronary artery. The autopsy also revealed the presence of advanced degenerative arteriosclerosis in the coronary arteries. Other evidence showed an extensive history of heart disease and advice to Bullard that he curtail his activity and not return to work. He was 50 years old at the time of his death.

Dr. Johnson, testifying for the plaintiff, opined that Bullard's work contributed to his injury. In his testimony he stated that he was sure, from the patient's history and the pathologist's physical findings, that the decedent still had an active myocardial infarction at the time he returned to work and that this underlying condition was aggravated by the stress involved in his particular kind of work, regardless of how minimal that might be.

The defendant's expert, Dr. Robert Schneck, disagreed. On cross-examination he elucidated his opinion by explaining that certain forms of "heart attacks" may be precipitated by stress and certain other forms are inevitable. Dr. Schneck premised his position on the fact that the autopsy report indicated that the decedent was suffering from advanced arteriosclerosis and that the myocardial infarction was precipitated by a thrombosis. He further mentioned that the very nature of a thrombosis or total occlusion of a coronary artery renders irrelevant any considerations involving the amount of stress to which Bullard may have been subject at the time of the infarction. He stated, essentially, that because the blood supply to the heart muscle becomes totally cut off when there is total occlusion, a coronary infarct would have formed regardless of the degree of heart activity.

Under Dr. Schneck's analysis, there was no causal relationship whatsoever between Bullard's work and his death.

In what may be viewed as conflict between experts, possibly emanating from a theoretical divergence, Dr. Schneck apparently elucidated his opinion more persuasively insofar as the Worker's Compensation Appeal Board was concerned. Although the referee awarded compensation to the plaintiff, the appeal board reversed the decision on the grounds that the plaintiff had failed to sustain the burden of proving any relationship between the decedent's employment and his death. The appeal board concluded that the decedent was the victim of an ordinary disease of life unaffected by employment exposures and was, therefore, not entitled to compensation.

*Hannula v Cleveland-Cliffs Iron Company*

Paul Hannula worked for the defendant, Cleve-

land-Cliffs Iron Company, as a "stope scraperman". His job entailed rather heavy work such as lifting, blasting, and operating heavy equipment. In June 1971, Hannula first noticed pain in his chest and arms while working. In August he consulted his family doctor, Kenneth Repola, who advised him to discontinue work because of the danger of heart attack. Hannula's last day of work was August 19, 1971. At the time of the hearing, December 5, 1972, he was 51 years old.

He filed a claim for compensation alleging that his heart condition was work-related. The medical witnesses agreed that Hannula was suffering from advanced arteriosclerotic heart disease, of which his work experience was not an etiological factor. They also agreed that Mr. Hannula had prodromal angina pectoris. Angina is a symptom of arteriosclerosis which manifests itself through debilitating pains in, about and extending from the chest cavity. The pains are essentially due to coronary insufficiency (lack of oxygen) and oftentimes precede myocardial infarctions. The experts further agreed that angina is neither a disease nor an injury. It is a symptom. As such it is evidence of a disability, but *per se,* not compensable even if aggravated only at work, unless the underlying disease or injury is work-related.

The plaintiff's expert, Dr. Young, stated that two episodes of prolonged chest pain were evidence of severe coronary insufficiency and opined that a myocardial infarction occurred during these instances.

Dr. Wright, testifying for the defendant, disputed such a claim, relying on Hannula's laboratory reports and X-rays which showed a normal heart. In essence, Dr. Wright's findings were that Mr. Hannula had not suffered an injury but was

forced to leave his employment because of a debility attributable to the underlying arteriosclerosis.

The referee awarded compensation to the plaintiff but the appeal board reversed the decision based on the fact that the tests, including an electrocardiogram, showed no signs of an infarction and the fact that Mr. Hannula's angina was the symptom of an ordinary disease of life.

## Fiszer v White Pine Copper Company

Jan Fiszer was employed by the defendant as a "lubeman" and later as a "hooker". He performed various duties throughout the copper mine. In May, 1970 he was involved in a truck accident at work. He experienced chest pains for three weeks following the accident and stopped working on May 23, 1970. He was hospitalized and the doctor diagnosed an ulcer, later changing his mind and diagnosing a heart ailment. Fiszer does not claim compensation based on this incident. His petition for hearing before the Bureau of Worker's Compensation alleges injury on or about his last day worked in 1972. Fiszer returned to work in October, 1971. On January 23, 1972, he experienced severe chest pain, later diagnosed as angina, while performing heavy work in cold weather. On the advice of his family doctor, he did not return to work. At that time, Fiszer was 46 years old.

There was extensive medical evidence in this case. Fiszer was examined by five doctors whose reports are all in the record. The general consensus was that Fiszer suffered from arteriosclerotic heart disease which was not work-related.

Once again Dr. Young testified for the plaintiff and postulated past myocardial infarction which he believed was caused by stress encountered in

the work-related truck accident. The balance of the medical evidence—the clinical test results and the diagnoses of the other four doctors—negated any findings of cardiac damage. In essence, the evidence preponderated in favor of the defendant's position that Fiszer's disability was due to the natural progression of coronary artery disease.

The Worker's Compensation Appeal Board reversed the referee's award of benefits to the plaintiff, holding that the disability was attributable to plaintiff's arteriosclerosis which was an ordinary disease of life and did not arise out of and in the course of plaintiff's long-time employment with defendant, White Pine Copper Company.

### Jarman v Atlas Supply Company

Jack Jarman was 36 years old at the time of this incident. His work as a general laborer and truck driver included the manual loading and unloading of heavy objects.

On the day before the heart attack which is the basis of his claim, Jarman worked a long shift and performed heavy work. He arrived at home at about 6 p.m. and spent a quiet evening playing cards with his wife and another couple. At midnight he retired only to awaken at about 3 a.m. with a nauseated feeling. He suffered a disabling myocardial infarction at approximately 4 a.m.

The fact that Jarman had a heart attack is not disputed, nor is it disputed that he suffered from pre-existing arteriosclerotic heart disease which was somewhat accelerated by his diabetes. The conflict in this case is whether Mr. Jarman showed a medical relationship between the stress encountered at his work and the myocardial infarction.

Dr. Sheperdigian, the plaintiff's treating physi-

cian, opined that the stress from Mr. Jarman's employment played a role in precipitating the subsequent heart attack. The defendant did not call a medical expert witness but chose instead to rely upon such factors as the underlying disease as well as the time lag between the actual labor and the subsequent attack to refute any possible relationships between the work and the infarction.

Although the hearing referee denied benefits to the plaintiff, the Worker's Compensation Appeal Board reversed. The appeal board concluded that the plaintiff had sustained his burden of proving a relationship between the heart attack and the work and, accordingly, awarded benefits.

It is elementary that in all workers' compensation cases the claimant must factually establish both a personal injury and a "medical cause in fact" relationship between his employment and that injury. Any legal test of causality[1] which this Court or any other may impose will ultimately be subject to these requirements. Absent a showing of the requisite factual relationship between a personal injury and an individual's employment, the injury cannot logically be said to arise "out of and in the course of his employment". MCLA 418.301; MSA 17.237(301).

---

[1] The legal test of causality is premised upon the coverage formula: "arising out * * * of his employment". Most courts in the past have interpreted this language to require a showing that the injury was caused by an increased risk to which the claimant, as distinct from the general public, was subjected by his employment. A number of courts have modified this peculiar or increased risk doctrine and accept a showing that the risk was actually a risk of employment regardless of whether it was common to the public. Also, a few courts have adopted the positional risk test, under which an injury is compensable if it would not have happened but for the fact that the conditions or obligations of his employment put the claimant in the position where he was injured. The proximate cause test, requiring forseeability and the absence of an intervening cause, has generally been abandoned. 1 Larson, The Law of Workmen's Compensation, §§ 6.00-13.23, pp 3-1—3-342.

The threshold question common to all of the cases before us is whether, in the evidence produced, that relationship has been shown. In *Kostamo, Bullard* and *Jarman,* although the existence of a personal injury, specifically a myocardial infarction, was not controverted, there was disagreement over whether the various claimed work-related stresses were factors in precipitating the infarction. In *Kostamo* and *Bullard,* the Worker's Compensation Appeal Board, undoubtedly upon consideration of the testimony of the parties' medical experts, determined that a factual relationship between the work and the injury was not established and, therefore, denied benefits to those plaintiffs. On the other hand, under different factual circumstances, the plaintiff in *Jarman* was determined to have met his burden of proof on this exclusively factual issue and was awarded benefits.

Similarly, the critical issue in both *Hannula* and *Fiszer* was strictly factual. In both of the cases, the Worker's Compensation Appeal Board determined essentially that the plaintiff did not establish the fact that he incurred a discrete injury, but instead merely suffered from a debility as the consequence of pre-existing, nonwork-related arteriosclerosis. Accordingly, in *Hannula* and *Fiszer* benefits were denied.

It is uncontroverted that the scope of our review in cases of workers' compensation is limited. *Zaremba v Chrysler Corp,* 377 Mich 226; 139 NW2d 745 (1966); *Coates v Continental Motors Corp,* 373 Mich 461; 130 NW2d 34 (1964); *Thornton v Luria-Dumes Co-Venture,* 347 Mich 160; 79 NW2d 457 (1956).

Const 1963, art 6, § 28 provides that "in the absence of fraud unless otherwise provided by law" findings of fact "in workmen's compensation pro-

ceedings shall be conclusive". Also, see MCLA
418.861; MSA 17.237(861).

This Court has repeatedly held and is firmly
committed to the rule that findings of fact are
conclusive if supported by any of the evidence
presented. *Hlady v Wolverine Bolt Co,* 393 Mich
368; 224 NW2d 856 (1975); *Johnson v Vibradamp
Corp,* 381 Mich 388; 162 NW2d 139 (1968); *Mitchell v Metal Assemblies, Inc,* 379 Mich 368; 151
NW2d 818 (1967);[2] *Thornton v Luria-Dumes Co-Venture, supra.*[3]

In the cases before us, the contested Worker's
Compensation Appeal Board determinations, concerning the relationship, if any, of the work-related stress to the subsequent heart episodes, were
exclusively factual in nature. In each instance the
factual determination of the Worker's Compensation Appeal Board was supported by competent
evidence.

In view of that fact and of this Court's limited
scope of review, the appeal board's decisions in all
five cases are affirmed.

COLEMAN, C.J., and FITZGERALD, J., concurred
with RYAN, J.

[2] "The sole question on review by the Court of Appeals, and in turn
here, is 'whether there is any evidence to support the award.'"
*Mitchell v Metal Assemblies, Inc,* 379 Mich 368, 370; 151 NW2d 818
(1967).

[3] "Our obligation is to accept, without question, findings that are
certified here if there be any evidence whatever to sustain those
findings, regardless of thought or suggestion addressed to improbability thereof." *Thornton v Luria-Dumes Co-Venture,* 347 Mich 160, 162;
79 NW2d 457 (1956).